Approved: _____
ELISHA KOBRE
Assistant United States Attorney

Before:  HONORABLE JAMES C. FRANCIS
         United States Magistrate Judge
         Southern District of New York

**17 MAG 647**

- - - - - - - - - - - - - - - - x
                                 :   SEALED COMPLAINT
UNITED STATES OF AMERICA         :
                                 :   Violations of
        - v. -                   :   18 U.S.C. §§ 2, 371, 1343; 15
                                 :   U.S.C. §§ 78j(b), 78ff; 17
STEVEN SIMMONS, and              :   C.F.R. § 240.10b-5
JOSEPH MELI,                     :
                                 :   COUNTY OF OFFENSE:
            Defendants.          :   NEW YORK
                                 :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

   ALEXANDER H. KURGANSKY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

**COUNT ONE**
**(Conspiracy to Commit Securities Fraud and Wire Fraud)**

   1.  From at least in or about November 2015 through in or about January 2017, in the Southern District of New York and elsewhere, STEVEN SIMMONS and JOSEPH MELI, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; and wire fraud, in violation of Title 18, United States Code, Section 1343.

   2.  It was a part and object of the conspiracy that STEVEN SIMMONS and JOSEPH MELI, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in

connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

3. It was a further part and an object of the conspiracy that STEVEN SIMMONS and JOSEPH MELI, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Acts

4. In furtherance of the conspiracy and to effect the illegal objects thereof, STEVEN SIMMONS and JOSEPH MELI, the defendants, and their co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

    a. In or about December 2015, SIMMONS spoke with the Chief Executive Officer of a particular investment entity, which is based in Westchester, New York, to solicit an investment in a particular hedge fund (the "Hedge Fund").

    b. On or about December 29, 2015, MELI directed a wire transfer in the amount of $1.5 million from a bank account controlled by MELI, which was located in New York, New York, to an account controlled by the Hedge Fund.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

5.  From at least in or about November 2015 through in or about January 2017, in the Southern District of New York and elsewhere, STEVEN SIMMONS and JOSEPH MELI, the defendants, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, SIMMONS and MELI, utilizing false representations, obtained funds from investors which were utilized to further the Ponzi-like operation of the Hedge Fund by making payments to earlier investors that had demanded the return of investments.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Wire Fraud)

6.  From at least in or about November 2015, up to and including in or about January 2017, in the Southern District of New York and elsewhere, STEVEN SIMMONS and JOSEPH MELI, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SIMMONS and MELI, utilizing false representations, obtained funds from investors which were utilized to further the Ponzi-like operation of the Hedge Fund by making payments to earlier investors that had demanded the return of investments.

(Title 18, United States Code, Sections 1343 & 2.)

## COUNT FOUR
### (Wire Fraud)

7. From at least in or about 2015 through in or about January 2017, in the Southern District of New York and elsewhere, JOSEPH MELI, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MELI, utilizing false representations regarding contracts his business purportedly had in place but in fact did not, induced investors to transfer funds to his company and then misappropriated funds and utilized investor money to make payments to earlier investors.

(Title 18, United States Code, Sections 1343 & 2.)

The bases for my knowledge and for the foregoing charge are, in part and among other things, as follows:

8. I have been a Special Agent with the FBI for approximately seven years. I am currently assigned to the squad within the New York Division responsible for investigating violations of federal securities laws and related offenses. As part of my work at the FBI, I have received training regarding securities fraud and white collar crimes. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

## RELEVANT ENTITIES AND INDIVIDUALS

9. At all relevant times, the Hedge Fund was an investment fund founded and managed by an individual, a co-conspirator not named as a defendant herein (the "Cooperating

Witness" or "CW-1"),[1] together with a partner (the "Partner"). The Hedge Fund maintained offices in Connecticut and New York, New York.

10. At all relevant times, STEVEN SIMMONS, the defendant, worked with CW-1 to solicit investments into the Hedge Fund through, among other means, pitching representatives of wealthy private families to invest. SIMMONS solicited these investments through a company operated by SIMMONS which advertised as specializing in allocating investment capital to various portfolio managers and "delivering consistent above market returns while maintaining a vigilant focus on capital preservation."

11. At all relevant times, JOSEPH MELI, the defendant, owned and operated a company, based in New York, New York, which purported to be in the business of purchasing, and reselling for profit, tickets to various live events including concerts and theatrical productions (the "Meli Company").

## OVERVIEW OF THE FRAUDULENT SCHEMES

12. As set forth below, STEVEN SIMMONS and JOSEPH MELI, the defendants, together with CW-1, participated in the operation of the Hedge Fund as a Ponzi scheme, by misappropriating funds from victim-investors which were used in repaying earlier investors in the Hedge Fund that were demanding the return of investment funds. SIMMONS and MELI solicited these investments through false representations to the investors, including that the invested funds would be used for legitimate, specified, investment purposes.

13. JOSEPH MELI, the defendant, additionally conducted a related fraudulent scheme in which MELI solicited investments from victim-investors through false representations that MELI had entered into an agreement to purchase tickets to a particular Broadway show, which MELI could then resell for a profit. In truth and in fact, MELI had not entered into such an agreement. In addition to providing a portion of these

---

[1] CW-1 is cooperating in the Government's investigation in the hopes of obtaining a cooperation agreement with the Government and leniency at the time of sentencing. Information provided by CW-1 has proven accurate and reliable and has been corroborated by, among other things, bank records and consensually recorded phone conversations and meetings, further described below.

fraudulently obtained funds to facilitate the Hedge Fund Ponzi activity with CW-1 as described above, MELI used another portion of the funds to make payments to another of MELI's investors who was demanding repayment. MELI also misappropriated investor funds for his own personal use.

### THE FRAUDULENT SCHEME RELATING TO THE HEDGE FUND

#### CW-1 Misappropriates Millions From A Hedge Fund Investor And The Investor Demands Return of Funds

14. From my interviews with CW-1 and my review of reports prepared by another special agent with the FBI ("Agent-1") based upon Agent-1's interviews with CW-1, I have learned the following, in substance and in part:

    a. In or about 2013, CW-1, together with the Partner, formed the Hedge Fund. The Hedge Fund was initially based in Manhattan. In or about late 2013, the Hedge Fund relocated to Connecticut but, throughout most of its existence, had also maintained an office in Manhattan. The Hedge Fund marketed itself as having access to high performing portfolio managers. The Hedge Fund maintained two funds to invest in securities, one for investments in Initial Public Offerings ("IPOs") and another in long/short equity positions. The Hedge Fund obtained assets through, among other means, promoters such as STEVEN SIMMONS, the defendant, who raised money directly from investors in exchange for informal payments by CW-1.

    b. The Hedge Fund maintained a bank account used primarily for its daily operations (the "Hedge Fund Management Account") and accounts at a particular prime brokerage firm (the "Prime Broker") including a particular brokerage account used for investments for the Hedge Fund's IPO investments (the "Hedge Fund Brokerage Account").

    c. From in or about March 2014 through in or about February 2015, a particular investment fund ("Victim Entity-1") invested a total of approximately $4.2 million in the Hedge Fund's IPO investment strategy. By in or about November 2015, CW-1 had misappropriated most of Victim Entity-1's funds through wire transfers to, among other things, personal bank accounts of CW-1 and the Partner.

    d. In or about late November 2015, a representative of Victim Entity-1, having learned that the balance in the Hedge Fund Brokerage Account was substantially less than the

approximately $4.2 million Victim Entity-1 had invested, called CW-1 demanding that all of Victim Entity-1's funds be immediately returned and threatening to report CW-1 to the United States Securities and Exchange Commission (the "SEC") if the funds were not immediately repaid.

### SIMMONS Fraudulently Obtains Funds From An Investor To Use To Repay The Hedge Fund Investor

15. From my interviews with CW-1 and my review of reports prepared by Agent-1 based upon Agent-1's interviews with CW-1, I have learned the following additional information, in substance and in part:

    a. In or about late November 2015, soon after CW-1's conversation with the representative of Victim Entity-1 as set forth above, CW-1 spoke with STEVEN SIMMONS, the defendant, among others, about obtaining funds in order to repay Victim Entity-1. Among other things, CW-1 told SIMMONS that CW-1 needed money because Victim Entity-1 was demanding a return of Victim Entity-1's investment funds, that CW-1 did not have Victim Entity-1's money, that CW-1 had to repay Victim Entity-1 by the end of 2015, and that CW-1 was concerned that Victim Entity-1 would report the missing funds to the SEC.

    b. SIMMONS agreed that he would assist CW-1 in obtaining funds that CW-1 could use to repay Victim Entity-1. SIMMONS told CW-1 that he would attempt to obtain additional investment funds from a previous investor in the Hedge Fund, Victim Entity-2, so that CW-1 could utilize the money to repay Victim Entity-1. Soon thereafter, SIMMONS relayed to CW-1 that SIMMONS had successfully solicited an additional investment from Victim Entity-2 by telling Victim Entity-2 that this new investment would be entrusted to a highly successful group of portfolio managers.

16. From my conversations with Agent-1 who conducted interviews with the Chief Executive Officer of Victim Entity-2 and an administrator employed by Victim Entity-2 (respectively, the "Victim Entity-2 CEO" and the "Victim Entity-2 Administrator"), and from reports prepared by Agent-1 based upon these interviews, I have learned the following:

    a. In or about early 2015, STEVEN SIMMONS, the defendant, approached the Victim Entity-2 CEO to solicit an investment from Victim Entity-2 into the Hedge Fund. SIMMONS told the Victim Entity-2 CEO that the Hedge Fund offered a

particular investment strategy relating to the purchase of securities that would help diversify Victim Entity-2's portfolio of investments. SIMMONS also told the Victim Entity-2 CEO that the Hedge Fund's major strength was the ability to allocate to portfolio managers with strong performance. SIMMONS further told the Victim Entity-2 CEO that SIMMONS himself was a major investor in the Hedge Fund.[2]

        b. In or about February 2015, Victim Entity-2 made an initial $250,000 investment in the Hedge Fund. SIMMONS represented to the Victim Entity-2 CEO that this money would be invested by a specific portfolio manager working with the Hedge Fund.

        c. In or about December 2015, SIMMONS spoke with the Victim Entity-2 CEO to solicit an additional investment in the Hedge Fund by Victim Entity-2. SIMMONS told the Victim Entity-2 CEO that these funds would be allocated among four portfolio managers working with the Hedge Fund including two particular portfolio managers ("Portfolio Manager-1" and "Portfolio Manager-2"). On or about November 24, 2015, Simmons sent to the Victim Entity-2 CEO an email attaching performance information regarding Portfolio Manager-1 and Portfolio Manager-2. Based upon these representations by SIMMONS, the Victim Entity-2 CEO agreed to invest an additional $600,000 with the Hedge Fund.

        d. In or about late 2016, Victim Entity-2 requested the return of the full amount of its investment with the Hedge Fund. To date, Victim Entity-2 has not received any of its funds from the Hedge Fund.

    17. Based upon my review of records relating to the Hedge Fund Management Account, I have learned that, on or about December 23, 2015, Victim Entity-2 wired $600,000 to the Hedge Fund Management Account. Prior to this deposit there was approximately $2,616 in the Hedge Fund Management Account. Approximately 11 minutes after the funds were received into the Hedge Fund Management Account, $500,000 was wired out to Victim Entity-1. The following day, an additional $50,000 was wired out to an account controlled by SIMMONS.

---

[2] From my interviews with CW-1, I have learned that SIMMONS had not invested any money with the Hedge Fund.

8

### MELI Fraudulently Obtains Funds From An Investor To Use To Repay the Hedge Fund Investor

18. From my interviews with CW-1 and my review of reports prepared by Agent-1 based upon Agent-1's interview with CW-1, I have learned the following additional information, in substance and in part:

   a. In or about late November or early December 2015, CW-1 also asked JOSEPH MELI, the defendant, for assistance in obtaining approximately $4 million for CW-1 to use to repay Victim Entity-1. CW-1 explained to MELI that CW-1 had an investor (Victim Entity-1) who wanted a redemption and was pressuring CW-1, but that the CW-1 did not have sufficient funds to repay the investor.

   b. MELI agreed to assist CW-1. Between on or about December 29, 2015 and April 15, 2016, MELI made several wire transfers from an account in the name of the Meli Company (the "Meli Company Account") to the Hedge Fund totaling approximately $3.75 million, which CW-1 then used, in part, to make payments to Victim Entity 1.

19. From my conversations with Agent-1, who conducted interviews with the Chief Financial Officer of another investment entity (respectively, the "Victim Entity-3 CFO" and "Victim Entity-3"), and from reports prepared by Agent-1 based upon these interviews, I have learned the following:

   a. In or about early 2015, the Victim Entity-3 CFO was first introduced to JOSEPH MELI, the defendant, regarding an investment opportunity with the Meli Company. In subsequent conversations, MELI told the Victim Entity-3 CFO that the Meli Company was in the business of purchasing and reselling concert, live event, and other theatrical tickets for a profit.

   b. MELI further told the Victim Entity-3 CFO that the Meli Company had reached an agreement with the producer of a particular Broadway show (respectively, the "Producer" and the "Show") to purchase a large number of tickets for the Show. MELI solicited an investment from the Victim Entity-3 CFO for the purpose of funding the purchase of tickets from the Producer. Prior to Victim Entity-3's decision to invest in the Meli Company, MELI provided the Victim Entity-3 CFO with a "Letter Agreement" between the Producer's production company (the "Production Company") and the Meli Company reflecting this agreement (the "Letter Agreement"). The Letter Agreement, which

9

was dated October 19, 2015, was signed by MELI as Managing Member of the Meli Company and the Producer on behalf of the Production Company.

   c. On or about December 28, 2015, Victim Entity-3 invested $1.25 million with the Meli Company with the understanding that the funds would be utilized by the Meli Company to purchase tickets to the Show as referenced in the Letter Agreement. This investment was formalized in a written agreement (the "Funding Agreement") between Victim Entity-3 and the Meli Company. The Funding Agreement provided for the repayment by August 31, 2016, of Victim Entity-3's full investment, plus agreed-upon returns of 10% interest on its investment and a share of the profits from the resale of the tickets. To date, Victim Entity-3 has not received its principal or the promised returns.

  20. From my conversations with Agent-1, who conducted an interview with the Producer of the Show, I have learned, among other things, that the Producer never entered into a contract or signed an agreement with JOSEPH MELI, the defendant, to sell tickets to the Show. MELI approached the Producer with an offer to purchase tickets for resale, but the Producer declined this offer and never entered into any agreement or otherwise did business with MELI.

  21. From my review of records for the Meli Company Account, which is based in Manhattan, I have learned the following:

   a. The first transfer from the Meli Company Account to the Hedge Fund Management Account for the purpose of returning Victim Entity-1's investment in the Hedge Fund, which took place on or about December 29, 2015 in the amount of $1.5 million, took place the day after the account received a transfer of $1.25 million from Victim Entity-3 which, as set forth above in paragraph 19, was purportedly an investment in the Meli Company for the purchase purchasing tickets to the Show. Prior to the transfer of this $1.25 million into the Meli Company Account, the account balance was approximately $785,000.

### MELI FRAUDULENTLY OBTAINS FUNDS FROM ADDITIONAL INVESTORS, MISAPPROPRIATES FUNDS, AND USES OTHER INVESTOR MONIES TO MAKE PAYMENTS TO A PREVIOUS INVESTOR

  22. From my conversations with Agent-1, who conducted an interview with an individual who founded and is a portfolio

manager for a particular investment entity (respectively, the "Victim Entity-4 Manager" and "Victim Entity-4"), and from my review of a report prepared by Agent-1 based upon that interview, I have learned the following:

    a. In or about August 2015, JOSEPH MELI, the defendant, solicited an investment from the Victim Entity-4 Manager purportedly for the purpose of funding the purchase of tickets to the Show from the Producer. MELI told the Victim Entity-4 Manager that he was close with the Producer and could arrange a meeting between the Producer and the Victim Entity-4 Manager. Although the Victim Entity-4 Manager was interested in such a meeting, MELI repeatedly put off the meeting and it never occurred.

    b. On or about October 13, 2015, MELI sent to the Victim Entity-4 Manager via e-mail an unsigned document, dated October 13, 2015, titled "Letter Agreement" reflecting an agreement for the sale by the Production Company to the Meli Company of tickets to the Show. I have reviewed the Letter Agreement provided by MELI to the Victim Entity-4 Manager, and it appears similar to the Letter Agreement MELI provided to Victim Entity-3.

    c. On or about October 14, 2015, Victim Entity-4 wired $3.5 million to the Meli Company to fund the purchase of tickets to the Show in exchange for an interest in profits from the resale of the tickets.

23. Based on my review of records for the Meli Company Account, none of these funds were, in fact, utilized to purchase tickets to the Show or any other live events.

24. As relayed by CW-1, in or about the middle of 2016, several months after MELI completed the wiring of a total of $3.75 million to the Hedge Fund Management Account for CW-1 to use to repay Victim Entity-1, MELI told CW-1 that the money had come from an investor in MELI's ticket resale business, which MELI identified to CW-1 as the Victim Entity-4 Manager. MELI told CW-1 that the Victim Entity-4 Manager had provided the money to MELI as an investment in MELI's ticket resale business and that the Victim Entity-4 Manager was now pressuring MELI for its money back. MELI asked CW-1 for the repayment of the money MELI had lent to CW-1 so that he could repay Victim Entity-4.

25. From my conversations with Agent-1 who conducted an interview with another individual who invested in the Meli

11

Company ("Victim-5"), and from my review of a report prepared by Agent-1 based upon that interview, I have learned the following:

   a. In or about late 2015 and early 2016, JOSEPH MELI, the defendant, told Victim-5 that MELI had reached an agreement to purchase, from the Producer, a large number of tickets for the Show and that MELI would resell these tickets at a profit. MELI also provided Victim-5 with a document titled "Letter Agreement," which I have reviewed, which purports to be an agreement between the Meli Company and the Production Company for the purchase of tickets to the Show. This agreement appears similar to the Letter Agreement MELI provided to Victim Entity-3 and Victim Entity-4.

   b. Victim-5 agreed to invest with the Meli Company with the understanding that the funds would be utilized by the Meli Company for the purpose of purchasing tickets to the Show and, on or about February 8, 2016, wired an investment of approximately $1.5 million to the Meli Company Account.

   26. From my review of bank records for the Meli Company Account, I have learned that, on or about February 9, 2016, the day after Victim-5 wired its $1.5 million investment to the Meli Company Account, $2.5 million was wired from the Meli Company Account to Victim Entity-4. Prior to Victim-5's transfer of $1.5 million into the Meli Company Account, the account balance was approximately $878,488.

   27. From at least in or about June 2015 through in or about December 2016, substantial funds from the Meli Company Account were used utilized for personal expenditures including, among other things, a March 1, 2016 wire transfer for approximately $82,000 to a retail jewelry establishment, a June 23, 2016 wire transfer for approximately $208,000 to a luxury car dealership, and a $49,440 check card expenditure at an Atlantic City casino.

### RECORDED CONVERSATIONS BETWEEN CW-1 AND SIMMONS AND MELI

   28. In or about December 2016, CW-1, through counsel, contacted the U.S. Attorney's Office for the Southern District of New York the "Office") and disclosed that CW-1 had misappropriated funds from Victim Entity-1 and that CW-1, working with STEVEN SIMMONS and JOSEPH MELI, the defendants, engaged in a scheme to obtain funds from other investors under false pretenses in order to generate funds to repay Victim Entity-1. CW-1 agreed to cooperate with law enforcement

authorities, including the Office and the Federal Bureau of Investigation (the "FBI"). On multiple instances between in or about December 2016 and January 2017, CW-1 consensually record conversations CW-1 had with SIMMONS and MELI.

29. Based on my review of audio recordings of consensually recorded phone calls between CW-1 and STEVEN SIMMONS and JOSEPH MELI, the defendants, which were each monitored by me or other special agents with the FBI, I have learned the following, in substance and in part:

    a. On or about January 11, 2017, CW-1 spoke by phone with SIMMONS about, among other things, Victim Entity-1's request for the return of its investment. During this call, SIMMONS acknowledged that the purpose of soliciting the investment from Victim Entity-2 in December 2015 had been to generate funds that CW-1 could utilize to pay back Victim Entity-1. In particular, after CW-1 asked "how much was the amount you got in when we had the [Victim Entity-1] issue," SIMMONS replied, in part, "I think it was like another 600 or something." During the same conversation, CW-1 told SIMMONS that "when [Victim Entity-1] went to shit and we needed the freaking stopgap . . . if you didn't make [Victim Entity-2] happen we would have gone to shit then." SIMMONS responded "Right."

    b. During a prior phone call between CW-1 and SIMMONS that took on or about December 30, 2016, SIMMONS explained to CW-1 that "the first thing we need to do is get Victim Entity-2 off the table" and that "my concern is this because [the Victim Entity-2 Administrator] had asked on more than one occasion, hey any chance you can put me in touch with the managers . . . I don't need him reaching out to [Portfolio Manager-1] or [Portfolio Manager-2] or whatever going, hey, no, there's no fucking money." Based upon my conversations with CW-1 and my knowledge of this investigation, I believe that, in this conversation, SIMMONS is telling CW-1 that he wants to quickly return Victim Entity-2's investment because if the Victim Entity-2 Administrator contacted the portfolio managers SIMMONS had represented would be given Victim Entity-2's funds to invest, the Victim Entity-2 Administrator would learn that they had not been given Victim Entity-2's money to invest as SIMMONS had promised.

    c. On or about December 19, 2016, CW-1 spoke by phone with MELI. During this call, the following topics, among others, were discussed:

13

      i. MELI told CW-1 that MELI had heard that the Hedge Fund was being audited by the SEC and that "I was like maybe the guys that were putting pressure on him [CW-1] last year . . . they decided they were just going to, they were going to wait until he was stable and then they were going to . . . try to pummel him." CW-1 responded, in substance and in part, that CW-1 thought that the SEC audit was the result of "pressures on your end and because he was a big name that maybe he found a way to tweak something . . ." MELI replied "it would be impossible for anyone on planet earth unless you told them . . . to know what we did."

      ii. Based upon my conversations with CW-1 and based upon my knowledge of this investigation, I believe that by "the guys that were putting pressure on him [CW-1] last year," MELI was referring to representatives of Victim Entity-1, who had demanded the return of Victim Entity-1's investment approximately one year earlier in late 2015. CW-1's reference to "pressures on your end" from a "big name" was to the Victim Entity-4 Manager, an individual CW-1 believed was well-known in the hedge fund industry who, according to MELI, was the source of the $3.75 million MELI had provided to CW-1 for the repayment of Victim Entity-1.[3] MELI then reassured CW-1 that it would be impossible for anyone to determine that MELI had misappropriated funds from MELI's own investor for use by CW-1 to repay the funds that CW-1 owed to Victim Entity-1.

      iii. CW-1 replied "but . . . didn't the money from the account simply go to me. . . . I was just worried that he came in and said let me see the . . . [name of a particular bank ("Bank-1")] account and they said who the hell is this guy and maybe he asked questions." CW-1 further told MELI "we should put something together to at least tie up a little bit of loose ends to explain you know . . . it makes me go back to the phone call where the woman asked when you were on the phone if this was related to tickets and we said yes. We should probably have something that says something related to that on it so we have it into perpetuity locked away in a drawer." MELI replied "yeah, yeah, yeah, no problem."

---

[3] Based on my review of bank records, and contrary to MELI's statement to CW-1, funds from Victim Entity-3, but not Victim Entity-4, were transferred by MELI to the CW-1 in order to make repayments to Victim Entity-1.

14

iv. Based upon my conversations with CW-1 and based upon my knowledge of this investigation, I believe that, in this portion of the conversation, CW-1 is relating to MELI CW-1's purported concern that the Victim Entity-4 Manager asked to see records of the Meli Company Account and questioned why MELI had transferred Victim Entity-4's investment to the Hedge Fund. CW-1 further reminded MELI that when MELI wired funds to the Hedge Fund, MELI had directed CW-1 that, if asked, to falsely tell Bank-1, where the Meli Company Account was held, that the purpose of the wire transfer was related to tickets. CW-1 further suggested to MELI that they create a written document falsely stating that the purpose of transferring the funds to the Hedge Fund was "related to tickets." MELI agreed to the creation of such false documentation.

v. Later in this call, MELI explained that he is "under the gun" and that "there's a guy named [Victim-5] . . . . I got to give him a couple million bucks. . . . He's already given me seven. . . . I've already given him back four. He's like, dude, is there a problem . . .?" CW-1 replied "but that's not me, though. . . . I mean mine was kind of the other guy's funds, right?" MELI replied "No, everything is fungible. I've been moving things around and playing the shell game to keep that prick at bay by giving him little payments, but I've been taking it from other people." Based upon my conversations with CW-1 and based upon my knowledge of this investigation, I believe that CW-1's reference to the "other guy" whose funds MELI provided to CW-1 and MELI's reference to "that prick" who MELI had kept "at bay" by taking from other people are both to the Victim Entity-4 Manager.

vi. Later in the same call, after CW-1 told MELI that "I thought . . . that [the Victim Entity-4 Manager] called the dogs on you," MELI replied "I was able to avoid it by shell gaming it, but I'm running out of that game too. And . . . that one will really have things come crashing down." MELI further told CW-1 that MELI's issues with investors resulted from "the fraudulent ticket deal that had this floated." MELI explained to CW-1 that "if this guy [Victim-5] does an audit, he's going to see that the money that should have gone to him went to [Victim Entity-4] and they're going to ask why the money went to [Victim Entity-4] who hasn't been involved in the business as long as they've been a part of it . . . that's where the wheels fall off for me."

d. During a phone call between MELI and CW-1 that took place on or about December 30, 2016, MELI told CW-1 that

15

"what happened was I took money basically from him [Victim-5], because . . . all I've been doing all along is the shell game. You know how it works, right? You take money from one guy to pay off the other guy. So I got [Victim Entity-4] pretty much in check. But I, based on my own misunderstanding of timing . . . and some other things going poorly for me, I now have this guy [Victim-5] all over me. He's a good guy, except for the fact that I've . . . basically missed on everything."

       e.  During another phone call between MELI and CW-1 that took place on or about January 11, 2017, MELI told CW-1 that Victim-5 "has been pushing me hard right now" for his money. MELI continued that "I got caught in a situation with a bad guy. I used good guys to help me get out of it. I wasn't totally forthright then and I regret doing that. I should have probably just said, hey look, I got into a fucked up situation I'm going to take this money to get out of that situation. I'm going to do that and put all future stuff against this, but it's not a forward investment, it's an investment to take this guy out. I didn't do that, and now I'm suffering . . . I've probably passed the point of coming clean with the guy."

       f.  Based upon my conversations with CW-1, and based upon my knowledge of this investigation, I believe that MELI's reference to using "good guys" to help MELI get out of a "situation" with a "bad guy" was to MELI's solicitation under false pretenses of an investment from Victim-5 for the purpose of repaying the money invested with MELI by Victim Entity-4.

       WHEREFORE, deponent prays that arrest warrants be issued for STEVEN SIMMONS and JOSEPH MELI, the defendants, and that SIMMONS and MELI be imprisoned or bailed, as the case may be.

                                           ALEXANDER H. KURGANSKY
                                           SPECIAL AGENT
                                           FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
26th day of January 2017

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK